IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

IN RE:                                     )
                                           )
TONY W. COLEMAN and                        )        Case No. 07-30271
STEPHANIE A. COLEMAN,                      )
                                           )
                    Debtors.               )

ORDER SUSTAINING, IN PART, GREEN TREE'S OBJECTION TO
CONFIRMATION OF PLAN

Creditor Green Tree Servicing, LLC, objects to confirmation of the Debtors' Chapter

13 Plan on the ground that, among other things, the Plan violates 11 U.S.C. § 1322(b)(2)

because it proposes to pay Green Tree less than the full amount of its claim which is secured

by a manufactured home.   Alternatively, Green Tree asserts that the Debtors have

undervalued the manufactured home securing Green Tree's claim.   This is a core proceeding

under 28 U.S.C. § 157(b)(2)(L) over which the Court has jurisdiction pursuant to 28 U.S.C.

§§ 1334(b), 157(a), and 157(b)(1).

Green Tree is the holder of a claim secured by a 1996 Chandaleur 16 x 80

Manufactured Home (the "Mobile Home") owned by Debtor Stephanie Coleman.  According

to Green Tree, Stephanie owes it approximately $23,000 on its claim.  The Debtors value the

Mobile Home at $6,000.  Their Plan proposes to bifurcate Green Tree's claim and pay Green

Tree an Equal Monthly Amount of $100 per month for 60 months.

Green Tree first asserts that the Plan impermissibly modifies its rights in violation of

§ 1322(b)(2). That section, commonly referred to as the "anti-modification provision,"

provides in relevant part that a plan may "modify the rights of holders of secured claims,

other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims. . . ."[1]  Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, there was little doubt that § 1322(b)(2)'s anti-modification provision applied only to real property, and not to a mobile home considered to be personal property under state law.  Relying on BAPCPA's expanded definition of "debtor's principal residence" in § 101(13A), Green Tree contends that § 1322(b)(2)'s anti-modification provision has also been expanded to include a mobile home, even if the mobile home is considered to be personal property under state law.

Specifically, § 101(13A) provides:

(13A) The term 'debtor's principal residence' –

> (A) means a residential structure, including incidental property, without regard to whether that structure is attached to real property; and

> (B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer.[2]

According to Green Tree, since § 101(13A)(B) of the Code now defines "debtor's principal residence" to expressly include a mobile or manufactured home, § 1322(b)(2)'s anti-modification provision is also expanded to include mobile homes.  To conclude otherwise, according to Green Tree, would render § 101(13A)(B) meaningless.

---

[1]  11 U.S.C. § 1322(b)(2).

[2]  11 U.S.C. § 101(13A).

2

I disagree.  As the court in *In re Cox*[3] pointed out, the phrase "debtor's principal residence" modifies "real property," not the other way around.[4]  I further agree with the *In re Herrin* court that § 101(13A) and § 1322(b)(2) can be read in a manner that gives meaning to every word in both statutes.[5]  In many states, including Missouri, a mobile home can be transformed from personal property into real property.  And, as the *Herrin* court pointed out, there are three states in which a mobile home can be converted to real property even when the debtor does not own the land to which it is attached.[6]  Hence, under the plain language of the § 1322(b)(2), in order for a secured claim to be included in the coverage of the antimodification provision, the claim must be (1) "secured only by a security interest in real property" and (2) the real property mortgaged must be the "debtor's principal residence."[7]  If the manufactured or mobile home is considered to be personal property under applicable state law, the antimodification provision would not apply.

In Missouri, a mobile home is considered in the first instance to be personal property, but it can be converted to real property if certain conditions are met.[8]  Pursuant to § 700.111

---

[3] ___ B.R. ___, 2007 WL 1888186 (Bankr. S.D. Tex. June 29, 2007).

[4] *Id.* at *2  n. 4.

[5] *In re Herrin*, ___ B.R. ___, 2007 WL 1975573 at *2 (Bankr. S.D. Ala. July 3, 2007).

[6] *Id.* at *5 (citing Ariz. Rev. Stat. § 33-1501; Cal. Health & Safety Code § 18551(a)(1)(A); N.C. Gen Stat. § 105-273(13)).

[7] *Id.  Contra In re Shepherd*, 354 B.R. 505 (Bankr. E.D. Tenn. 2006).

[8] *Housley v. Mericle*, 57 S.W.3d 360, 364 (Mo. Ct. App. 2001) ("A manufactured home is considered personal property until converted to real property, pursuant to § 700.111.").  *See also In re Thornton*, 269 B.R. 682, 685 (Bankr. W.D. Mo. 2001).

of the Missouri Statutes:

> 1.  The owner of a manufactured home may convert the manufactured home to real property by:
>
>> (1) Attaching the manufactured home to a permanent foundation situated on real estate owned by the manufactured home owner; and
>>
>> (2) The removal or modification of the transporting apparatus including but not limited to wheels, axles and hitches rendering it impractical to reconvert the real property thus created to a manufactured home.
>
> 2.  The conversion of a manufactured home to real property by the method provided in subsection 1 of this section shall prohibit any political subdivision of this state from declaring or treating that manufactured home as other than real property.[9]

Here, if these conditions are present, the Debtors' Mobile Home would fall within the antimodification provision because it would be considered to be real property under Missouri Law.

"The burden of proof in an objection to confirmation in a Chapter 13 case is on the objecting creditor.  The debtor then has the burden of coming forward with evidence to rebut any evidence introduced by the objecting creditor."[10]

Mrs. Coleman was the only witness as to the antimodification provision.  She testified that she owns the land on which the Mobile Home sits.  However, the Mobile Home is sitting on bricks and is tied to the land with what she referred to as "standard tie-downs" connected to metal poles hammered into the ground.  It has no foundation, and is not permanently

---

[9]  Mo. Rev. Stat. Ann. § 700.111.

[10]  *In re Gatlin,* 357 B.R. 519, 521 -522 (Bankr. W.D. Ark. 2006) (citations omitted).

4

secured to the real property.  She further testified that, in order to move it, all she would need

to do is get a person with a truck out there, untie it, hoist it up, put wheels on it, and drive it

off.  In fact, she had done that very thing when she moved it from another location to its

current location in 1999.  There was no evidence as to whether skirting had been installed

around the Mobile Home, whether it had a deck or porch, or whether it was attached to a

well, or a septic system, or any other permanent type of fixture.

Based on this testimony, I find that the Mobile Home has not been permanently

attached to the real estate under § 700.111.  It is, therefore, personal property and Green

Tree's claim can thus be modified under the Debtors' plan.

Green Tree next contends that the Debtors have undervalued the Mobile Home.  As

stated above, the Debtors value it at $6,000, which is based simply on the Debtors' own

estimate of what it is worth.  Green Tree asserts that it is worth $14,972.58, based on

NADA's "replacement value."

I note at the outset that, although Green Tree has filed a Proof of Claim in which it

asserts that its $22,735.50 claim is fully secured, the Debtors have not yet objected to it.

Rather, the issue of the Mobile Home's valuation has arisen here in the context of Green

Tree's objection to plan confirmation, not in the context of claim allowance.  One court has

suggested that resolving what amounts to a claim objection in a plan confirmation proceeding

could possibly be procedural error, particularly if the creditor is not aware that its claim is

at issue.[11]  However, if the parties voluntarily proceed in this manner, and the confirmation

proceeding is essentially a two-party dispute over the value of the creditor's secured claim,

then any procedural defect is both waived and harmless.[12]  Indeed, proceeding in this manner

is commonplace in this district,[13] and benefits all parties because it promotes prompt

confirmation of plans and, hence, prompt payments to creditors by the Chapter 13 Trustee.

That being the case here, because valuation in the plan confirmation context

implicates claim allowance, it is appropriate to apply the burden of providing evidence

normally applicable in the claims allowance context.

> Rule 3001(f) of the Federal Rules of Bankruptcy Procedure provides that a
> properly executed proof of claim is prima facie evidence of the validity and
> amount of the claim.  A party in interest may, however, file a written objection
> to a proof of claim.  If an objection to a claim is supported by sufficient
> evidence to rebut the presumption, the burden of proving the validity and
> amount of the claim shifts back to the claimant.  In other words, once
> sufficient evidence is offered to rebut the prima facie validity of a proof of
> claim, the respective parties have the same burden of proof they would have
> under non-bankruptcy law.[14]

As discussed in more detail below, Mrs. Coleman testified as to value at the hearing on

---

[11]  *See In re Garvida*, 347 B.R. 697, 703-04 (B.A.P. 10th Cir. 2006).

[12]  *Id.*

[13]  In fact, as it did in this case, plan confirmation sometimes occurs in this district even before the claims bar date passes.  The claims bar date in this case is August 21, 2007.

[14]  *In re Revelle*, 256 B.R. 905, 910 (Bankr. W.D. Mo. 2001) (*citing Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *Brown v. Internal Revenue Service (In re Brown)*, 82 F.3d 801, 804 (8th Cir. 1996); *In re Interco Inc.*, 211 B.R. 667, 677 (Bankr. E. D. Mo. 1997); *In re Hydorn*, 94 B.R. 608, 612 (Bankr. W.D. Mo. 1988); Fed. R. Bankr. P. 3001(f) and 3007)).

confirmation.  That evidence was sufficient to rebut the prima facie validity of Green Tree's

claim as to the Mobile Home's value.  Thus, the initial burden of proving value shifted to

Green Tree.

I recently issued a decision discussing the valuation of vehicles in light of BAPCPA's

new definition of "replacement value" in § 506(a)(2).[15]  That section provides:

> If the debtor is an individual in a case under chapter 7 or 13, such value with
> respect to personal property securing an allowed claim shall be determined
> based on the replacement value of such property as of the date of the filing of
> the petition without deduction for costs of sale or marketing.  With respect to
> property acquired for personal, family, or household purposes, replacement
> value shall mean the price a retail merchant would charge for property of that
> kind considering the age and condition of the property at the time value is
> determined.[16]

This definition clarified that a court is to use retail merchant values, taking the condition of

the vehicle into account, and using the value at the time the determination is being made.

This provision would apply not only to vehicles, but to any personal property securing an

allowed claim, including the Mobile Home at issue here.

In *Cheatham*, I concluded that, in keeping with the Supreme Court's directive in

*Associates Commercial Corp. v. Rash*,[17] and this district's bankruptcy court's pre-BAPCPA

---

[15]  *See In re Cheatham*, No. 07-40509,*Order Setting Rehearing on Objection to Confirmation* (Doc. #63) (Bankr. W.D. Mo. June 19, 2007).

[16]  11 U.S.C. § 506(a)(2).

[17]  520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d. 148 (1997).

decisions in *Podnar*[18] and *Renzelman*,[19] a simple rule of valuation is still needed to serve the

interests of predictability and uniformity, even after the enactment of § 506(a)(2).[20] Although

I recognized the continued difficulties in applying Kelley Blue Book or NADA in valuing

vehicles, I concluded that the *Podnar* and *Renzelman* decisions are still appropriate, with

some modification.

Specifically, NADA retail value can still be the starting point in determining value of

a vehicle, unless it is shown that that value is not useful in the area in which the vehicle

would be sold, or NADA is not appropriate in a particular instance.  If NADA is used as the

starting point, however, then that value must be adjusted to account for the expense needed

to bring the vehicle to "clean" condition as described by NADA.[21]  Since a debtor has

superior access to the evidence needed to show the defects in the vehicle, and the cost of

repair, I held that it should be the debtor who bears the burden of offering evidence as to any

---

[18]  *In re Podnar*, 307 B.R. 667, 671 n.6 (Bankr. W.D. Mo. 2003) ("The bankruptcy judges
for the Western District of Missouri . . . have adopted a 'starting point' valuation standard in
Chapter 13 cases whereby the replacement value of a motor vehicle is set at the [NADA] retail
value less five percent.").

[19]  *In re Renzelman*, 227 B.R. 740 (Bankr. W.D. Mo. 1998).

[20] *In re Cheatham*, No. 07-40509, slip op. at 7.

[21]  NADA defines "Clean Retail Value" as follows:

A Clean Retail vehicle will be clean and without glaring defects.  Tires and glass
should be in good condition.  The paint should match and have a good finish.  The
interior should have wear in relation to the age of the vehicle.  Carpet and seat
upholstery should be clean, and all power options should work.  The mileage
should be within the acceptable range for the model year.

*See* NADA's website at http://www.nadaguides.com.

such adjustments to the NADA value.[22]  Then, once the adjusted NADA retail value is determined, a further adjustment must be made to reflect the fact that NADA's average retail value is "the price you could expect to receive if you sold the vehicle to a private party or the dealer's asking price on a used car lot."[23]  The Code definition of "replacement cost" is the price a retail merchant would "charge," which is no doubt different from the dealer's "asking price." Since no empirical evidence has been offered in any case before this Court to demonstrate the average difference between a dealer's asking price and what they ultimately end up charging at the end of negotiations, I concluded that there was no reason to change the system currently in effect in this district via *Podnar* and *Renzleman*, in which it is presumed that the actual value of the vehicle is 5% less than the asking price reflected in the NADA retail.

Hence, to summarize, with regard to vehicles, valuation is determined by starting with the NADA "Retail Value," less the amount it would cost to put the vehicle into "clean" condition as defined by NADA, less 5%. If this formula is not appropriate under the circumstances of a particular case, the parties are free to submit further evidence of actual value.

With manufactured homes, NADA provides a value report based on the general specifications of the particular manufactured home.  According to NADA, "[t]he guidebook value for a manufactured, mobile, or modular home is considered a Depreciated Replacement

---

[22] *See,* 21B Fed. Prac. & Proc. Evid. § 5122 (2005).

[23] http://www.nadaguides.com.

Cost in Retail Dollars."[24]  "By definition the Depreciated Replacement Cost is the cost to replace and [sic] item less accrued depreciation."[25]

In this case, Green Tree submitted an NADA Appraisal Guides Value Report which valued the Mobile Home at $14,972.58.  Unlike cars, the NADA value as to mobile homes tells what the vehicle will actually sell for.  Therefore, that value, without a percentage deduction, is an appropriate starting point for valuation.  The report presumes the Mobile Home is in "average condition."  Thus, as with valuations used for vehicles, described above, the Debtors in this case must show what it would cost to bring the Mobile Home to "average condition."

Mrs. Coleman testified and submitted photos showing several problems and damage to the Mobile Home's actual condition.  However, she essentially testified that she had no idea what it would cost to repair the damage.  Based on the evidence and testimony, I find that the value of the Mobile Home is $14,972.58.

That being the case, Green Tree's objection to the Plan on the ground that it violates § 1325(a)(5)(B)(ii) because property to be distributed under the plan is less than the amount of its secured claim is well-taken.  Debtors will be directed to file an amended plan that provides for the payment of Green Tree's secured claim as required under § 1325(a)(5).

Finally, Green Tree asserts that confirmation should be denied because the Plan was not filed in good faith as required by § 1325(a)(3).  In light of the foregoing, I find that,

---

[24] *Id*.

[25] *Id.*

10

although the Plan as submitted cannot be confirmed, the Debtors proposed the Plan in good

faith.

ACCORDINGLY, Green Tree's Objection to Confirmation of the Plan is

SUSTAINED, in part.  The Debtors are DIRECTED to file an amended plan providing for

Green Tree's secured claim in the amount of $14,972.58.

IT IS SO ORDERED.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: August 2, 2007

Attorney for movant to serve parties not receiving electronic notice